## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MT. TAI ASSET MANAGEMENT CORP.,

       Plaintiff,                         Case No. 09-10685

v.                                     Hon. Gerald E. Rosen

METRO EQUITY GROUP, LLC, COREY
HOWARD, EXCEL ESCROW SERVICES, LLC,
EXCEL TITLE AGENCY, LLC, JANEL CHIPMAN,
JUDITH A. STIRNEMANN, and JENNY KINNAIRD,

       Defendants.
_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____January 10, 2011_____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Mt. Tai Asset Management Corp. commenced this action in this Court on February 24, 2009, asserting breach of contract and tort claims against a number of defendants arising out of an unsuccessful real estate transaction.  Plaintiff's claims against Defendants Metro Equity Group, LLC and Corey Howard have been resolved through the entry of a consent judgment, and its claims against Defendants Judith Stirnemann and Jenny Kinnaird were dismissed through a February 2, 2010 stipulated order.  As a result,

only three of Plaintiff's claims remain pending: (i) a breach of contract claim against Defendants Excel Escrow Services, LLC and Excel Title Agency, LLC; (ii) a negligence/breach of fiduciary duty claim against Defendants Excel Escrow Services and Janel Chipman; and (iii) a claim of unjust enrichment against each of these three Defendants.

Presently pending before the Court are three motions — one filed by Plaintiff, one filed by Defendants Excel Escrow Services and Chipman, and the third filed by Defendant Excel Title Agency[1] — in which each of the remaining parties seeks summary judgment in its favor on some or all of the three remaining counts of Plaintiff's second amended complaint.[2] In support of its motion seeking partial summary judgment in its favor on Counts I and II of its complaint, Plaintiff argues that Defendants breached an implied contract and their fiduciary duties by improperly disbursing funds deposited by Plaintiff into an escrow account for the purpose of financing real estate transactions that never occurred. For their part, Defendants contend that they owed neither contractual nor fiduciary duties to Plaintiff, where they purportedly served as escrow agent solely for the benefit of co-defendant Metro Equity Group.

Each of these three motions has been fully briefed by the parties. Having reviewed

---

[1]Defendants Excel Title Agency and Excel Escrow Services are represented by separate counsel.

[2]In a fourth pending motion, Defendants Excel Escrow Services and Janel Chipman seek an award of summary judgment in their favor on their cross claim of indemnification against Defendants Metro Equity Group and Howard. This motion will be addressed in a separate order.

the parties' motions, briefs, and accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on these motions.

## II.  FACTUAL BACKGROUND

On August 1, 2008, Plaintiff Mt. Tai Asset Management Corp. and Defendant Metro Equity Group, LLC ("MEG") executed the "Metro Equity Group Offer to Purchase Asset Agreement" (the "Agreement"). (Second Amended Complaint, Ex. 1.) Under the Agreement, MEG promised to acquire an accompanying list of 67 residential properties in southern California, and Plaintiff, in turn, promised to purchase these properties once MEG had acquired them. The Agreement set a purchase price for these properties of 54.5 percent of their current value, or just over $13 million. The Agreement stated that "[t]ime shall be of the essence," and called for a closing date "on or before September 14, 2008." (Agreement at ¶ 4.)[3]

In order to facilitate the acquisition of the properties referenced in the Agreement, Plaintiff was required to "deposit with [Defendant] Excel Title Agency, LLC . . . the sum of One Million USD ($1,000,000)." (Agreement at ¶  2.) According to Plaintiff, this

---

[3]The parties later executed an addendum that changed the closing date to "on or before September 19, 2008." (Plaintiff's Motion, Ex. 2, Addendum at ¶ F.)

amount reflected a deposit of $14,925 for each of the 67 properties MEG promised to acquire, with these funds to be used by MEG to place earnest money deposits ("EMDs") towards the purchase of each of these properties.  (*See* Plaintiff's Motion, Ex. 2, Addendum at ¶ C (calling for Plaintiff to receive a credit of $14,925 "for each property to the limit of the One Million USD ($1,000,000) EMD on deposit with Excel Title Agency").)  Defendant Janel Chipman — one of the owners of Defendant Excel Title Agency, LLC ("ETA") and the sole owner/member of Defendant Excel Escrow Services, LLC ("EES") — expressed a similar understanding at her deposition, testifying that the funds deposited by Plaintiff with ETA were intended for use as EMDs on the properties in California that Plaintiff wished to purchase under its Agreement with MEG.  (*See* Plaintiff's Motion, Ex. 5, Chipman Dep. at 30-32, 35.)

Under the Agreement, Plaintiff reserved "the right to cancel this transaction for any reason during the due diligence period," which was defined as a period of "FOURTEEN business days from the date of deposit of earnest money."  (Agreement at ¶¶ 2, 11; *see also* Plaintiff's Motion, Ex. 2, Addendum at ¶ D (reciting MEG's agreement "that should Purchaser [*i.e.,* Plaintiff] decide to cancel transaction within due diligence period, they shall receive full refund of the EMD with no fees or charges withheld").)  After this due diligence period, however, the Agreement called for Plaintiff to pay specified amounts in expenses and liquidated damages if it elected to cancel the transaction:

Should this cancellation occur after the due diligence period and title

4

searches have been engaged, the Purchaser will forfeit $500.00 per property for charges and expenses incurred.  Should the Purchaser drop properties or cancel entirely DURING the CLOSING, there is a penalty of $750.00 per property that will remain for charges and expenses incurred plus Two Thousand Five Hundred USD ($2,500) in Liquidated Damages assessed per property.

(Agreement at ¶ 2.)

As amply reflected in the record, the transaction that went forward deviated in many respects from the terms of the Agreement between Plaintiff and Defendant MEG. First, on August 8, 2008, Plaintiff transmitted to Defendant ETA the amount of $686,550.00, rather than the $1 million deposit called for in the Agreement.  According to Plaintiff, when it made this smaller deposit, only 46 of the 67 properties identified in the Agreement were still available, so Plaintiff determined that a deposit of 46 times the agreed-upon EMD of $14,925 per property, or $686,550.00, was the appropriate amount to transmit to Defendant ETA.[4]  In addition, Defendant Janel Chipman testified (and the record otherwise confirms) that only six EMDs were paid from the escrowed funds during August and September of 2008, encompassing only a small fraction of the 67 properties referenced in the Agreement.  (*See* Chipman Dep. at 35-37, 90-91.)

In the midst of this period when properties were to be acquired by MEG and purchased by Plaintiff, Ms. Chipman was advised by ETA's underwriters,

---

[4]Although Plaintiff states in its motion that "only 49 properties were still available," (Plaintiff's Motion, Br. in Support at 3), the total amount of its August 8, 2008 deposit, $686,550.00, suggests that the correct number is *46* properties — *i.e.,* 46 times $14,925 per property equals $686,550.00, while 49 times $14,925 per property would have resulted in a deposit of $731,325.00.

LandAmerica/Lawyer's Title, that because the properties in question were not located in Michigan and ETA was not insuring them, the escrowed funds provided by Plaintiff should not be held by ETA, but should instead be transferred to another entity.  Acting on this advice, Ms. Chipman formed a new business entity, Defendant EES, and transferred the escrowed funds from ETA to EES.[5]  Ms. Chipman informed Defendant MEG of this transfer by letter dated September 10, 2008, (*see* Plaintiff's Motion, Ex. 7), but Plaintiff evidently was not advised of this transfer.

According to Plaintiff's vice president, Chih Wei Lee, no closings on properties occurred on or before the revised closing date of September 19, 2008, nor was Plaintiff aware of any properties that were ready to close prior to this date.  (*See* Plaintiff's Motion, Ex. 11, Lee Aff. at ¶¶ 3, 5.)  Thus, in a September 22, 2008 e-mail sent to a representative of Defendant MEG and copied to Ms. Chipman, Mr. Lee stated:

> For the record, the Escrow and Purchase Contract between Metro and Mt. Tai expired last Friday, September 19th, 2008.  Not 1 piece of property was delivered out of the 50 properties that were identified by me weeks earlier.  Mt. Tai placed the Earnest Money Deposit in Excel Title Agency as promised, sent it[]s employees into the field to valuate about 70+ properties, performed hours of due diligence, as well as set aside time to speak with you guys in order to get this deal closed.  Mt. Tai has done more than enough to fulfill and satisfy its part of this agreement.  You, on the other hand, have had a different story each time we spoke as to why Metro

---

[5]This transfer was achieved through two checks, the first written on September 10, 2008 in the amount of $532,500.00, and the second issued on October 7, 2008 in the amount of $117,050.00.  Notably, these amounts together do not equal the $686,550.00 paid by Plaintiff into the escrow account.  Ms. Chipman testified at her deposition that the shortfall was due to (i) the six EMDs paid from the escrow account, totaling $31,000.00, and (ii) $16,750.00 in fees taken by EES from the escrow account.  (*See* Chipman Dep. at 90-91; *see also* Plaintiff's Motion, Ex. 10 ("Accounting" document prepared by Ms. Chipman).)

6

> could not materialize the deal.  You then have the GALL TO SUGGEST
> that LIQUIDATED DAMAGES SHOULD BE APPLIED TO MT. TAI??
>
> * * * *
>
> I hereby demand you to instruct Janel [Chipman] at Excel Title
> Agency to wire the deposit back to Mt. Tai Asset Management account by
> Tuesday, September 23, 2008, to avoid the legal hassle to everyone
> invol[v]ed here.

(Plaintiff's Motion, Ex. 13; *see also* Lee Aff. at ¶ 3.)  Similarly, a representative of

Pristine Escrow, Inc. — an agency in California that was working with Plaintiff in

connection with the anticipated closings on California properties pursuant to the

Agreement — sent a September 19, 2008 e-mail to an MEG representative stating:

> [Mr. Lee] called this afternoon regarding the bulk purchase
> transaction between Mt Tai asset management and Metro Equity Group, he
> indicated that the closing date stated in item #4 of the Offer to purchase
> asset agreement has expired.  As of Today, Buyer has not received
> confirmation from Metro Equity group regarding final acquisition of
> property; therefore Mt. Tai Asset management is no longer in position to
> proceed with this transaction.  [Mr. Lee] proceeded with ordering
> cancellation of this escrow.  An Escrow Cancellation instruction is attached
> hereto.  Please kindly have buyer and seller sign and fax back to me.

(Plaintiff's Motion, Ex. 12.)  Despite these demands, Plaintiff's deposit was not returned.

Nonetheless, the parties continued to discuss the possibility that at least some

properties could be acquired by MEG for purchase by Plaintiff.  In a September 18, 2008

e-mail to an MEG representative, for example, Mr. Lee again asked that ETA be

instructed to "release and wire back the full Earnest Money Deposit," but he indicated

Plaintiff's willingness to purchase any properties that MEG proved "able to deliver after

September 19, 2008," albeit under a "new set of Escrow Instructions and a new Purchase

Agreement drawn up for those properties." (Plaintiff's Response to Defendant EES's

Motion, Ex. 27.) Likewise, at the very end of September 2008, the parties and their

representatives exchanged e-mails and correspondence regarding the possible acquisition

of properties, (*see* Defendant EES's Motion, Exs. 7, 8), but Plaintiff elected not to wire

the funds sought by MEG for this transaction, citing a lack of proper documentation and

apparent discrepancies between the purchase prices offered by MEG and the prices

Plaintiff was willing to pay for the properties, (*see* Lee Aff. at ¶¶ 7-8).

On October 6, 2008, Defendant Corey Howard, the managing (and sole) member

of MEG, wrote to Ms. Chipman of EES, stating:

> I, Corey Howard of Metro Equity Group, LLC am advising you that
> Mt. Tai Asset Management Group has breached the contract between Metro
> Equity Group, LLC and Mt. Tai Asset Management Group as of October 6,
> 2008 for failure to comply with escrow instructions dated September 30,
> 2008 and for failure to consummate this transaction. Please forward any
> remaining escrow money to Metro Equity Group, LLC to assess liquidated
> damages.

(Plaintiff's Motion, Ex. 18.) On October 8, 2008, EES transferred all remaining funds in

the escrow account (totaling $649,500.00[6]) to an MEG "General Account," (*see*

Defendant EES's Motion, Ex. 4), although Plaintiff states without contradiction that "the

money remained in EES's bank account," (Plaintiff's Motion, Br. in Support at 8).

Plaintiff was not informed about this transfer.

---

[6]As noted earlier, this is less than the amount initially deposited by Plaintiff into the
escrow account, with the shortfall due to (i) EMDs paid from the escrow account, and (ii) fees
taken by EES from the account.

8

On October 10, 2008, Mr. Howard of MEG gave "official notification" of

Plaintiff's purported "failure to perform" under the Agreement, stating in a letter to Mr.

Lee:

> As stated in our contract, liquidated damages must be assessed as
> Metro Equity Group, LLC is assessed damages for costs incurred. The total
> cost of $186,000 is assessed to Roger Lee and the Mt. Tai Project. The
> remaining amount of $500,000 will be refunded to the properly designated
> account.

(Plaintiff's Motion, Ex. 20.) As Plaintiff observes, there is no identified basis in the

record for Mr. Howard's computation of $186,000 in liquidated damages.

Despite Mr. Howard's representation in his October 10, 2008 letter, there is no

evidence in the record that any funds from the escrow account — whether $500,000 or

any other amount — were ever refunded to Plaintiff. Rather, the MEG ledger produced

by Plaintiff indicates that the funds from the escrow account were intermingled with

MEG's general account — which, notably, had a negative balance at the time the

escrowed funds were transferred to this account — and disbursed to a number of

recipients, including Mr. Howard, ETA, EES, and Ms. Chipman. (*See* Plaintiff's Motion,

Ex. 19.) Specifically, Plaintiff states without contradiction that "[b]y the time the [MEG]

account was nearly drained in February, 2009, Howard had received $140,100.00 and

ETA, EES and Chipman had taken $62,283." (Plaintiff's Motion, Br. in Support at 9.)[7]

---

[7]Plaintiff further notes that $369,348.07 was disbursed from the MEG account in
November of 2008 and deposited with the Clerk of the U.S. District Court for the Eastern
District of Michigan, pursuant to a stipulated order entered in *Lincoln Properties v. Metro Equity
Group LLC,* Case No. 08-14791. Just a few days later, the claims asserted against EES, ETA,
and Ms. Chipman in that case were dismissed with prejudice, and a consent judgment

This suit followed, with Plaintiff seeking to recover against Defendants ETA, EES and Chipman under theories of breach of contract, negligence/breach of fiduciary duty, and unjust enrichment.

## III.  ANALYSIS

### A.      The Standards Governing the Parties' Cross-Motions

Through the present motions, each of the moving parties seeks summary judgment in its favor on some or all of Plaintiff's three pending claims against Defendants ETA, EES, and Chipman.  Under the pertinent Federal Rule, summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where a moving party — here, Plaintiff — seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.

---

subsequently was entered against MEG in precisely the amount deposited with the court.

1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.    Plaintiff's Breach of Contract Claim Against Defendants ETA and EES

In Count I of its second amended complaint, Plaintiff alleges that Defendants ETA and EES breached implied contractual duties to hold Plaintiff's funds in escrow and to disburse these funds solely in accordance with the terms of the underlying Agreement between Plaintiff and MEG. In Plaintiff's view, Defendants' breach of these duties is established as a matter of law, where ETA and EES not only failed to return the escrowed funds to Plaintiff when the transaction contemplated in the Agreement did not go through, but instead transferred the entirety of these funds (less a handful of earnest money deposits and some fees) to MEG. In response — and in support of their own cross-

11

motions for summary judgment in their favor on this breach of contract claim —

Defendants ETA and EES insist that the record fails to give rise to an implied contractual

relationship with Plaintiff, and that, even if it did, Plaintiff cannot establish a breach of

any such implied contractual duties.  As discussed below, the Court finds that Plaintiff

has the better of the argument on these points.

Plaintiff acknowledges that it did not enter into an express contract, whether

written or otherwise, with Defendants ETA or EES.  Rather, Plaintiff's breach of contract

claim against these two Defendants rests upon allegations that the parties' conduct gave

rise to an implied contract that governed ETA's and EES's handling of the funds Plaintiff

placed on deposit with these entities under its Agreement with MEG.  Under Michigan

law,[8] "[a] contract implied in fact arises under circumstances which, according to the

ordinary course of dealing and common understanding[] of men, show a mutual intent to

contract."  *Erickson v. Goodell Oil Co.,* 384 Mich. 207, 180 N.W.2d 798, 800 (1970); *see*

*also Kingsley Associates, Inc. v. Moll Plasticrafters, Inc.,* 65 F.3d 498, 504 (6th Cir.

1995).  "A contract is implied in fact where the intention as to it is not manifested by

direct or explicit words between the parties, but is to be gathered by implication or proper

deduction from the conduct of the parties, language used or things done by them, or other

---

[8]The parties seemingly agree that Michigan law governs Plaintiff's claims in this case, as they have cited only to Michigan law in their briefs.  In addition, the underlying Agreement between Plaintiff and MEG stated that it was to be "governed by and construed in accordance with the law of the State of Michigan," (Agreement at ¶ 10), although a subsequent addendum to the Agreement provided that this paragraph of the Agreement was "hereby omitted," (Plaintiff's Motion, Ex. 2, Addendum at ¶ G), without specifying or suggesting any body of law that should be substituted for Michigan law.

pertinent circumstances attending the transaction." *Erickson,* 180 N.W.2d at 800. "The existence of an implied contract, of necessity turning on inferences drawn from given circumstances, usually involves a question of fact, unless no essential facts are in dispute." *Erickson,* 180 N.W.2d at 800.[9]

In seeking summary judgment in their favor on Plaintiff's claim of breach of an implied contract, Defendants ETA and EES point to a number of circumstances which, in their view, belie the notion that they and Plaintiff manifested any mutual intent to enter into a contractual relationship. First, they note the absence of evidence of any discussions between representatives of Plaintiff and either ETA or EES regarding the duties that the latter would perform in holding Plaintiff's funds in escrow. Because "Plaintiff and these Defendants never even spoke about this transaction," Defendant EES surmises that "no mutuality of assent could possible have arisen." (Defendant EES's Motion, Br. in Support at 8.) Yet, as is evident from the foregoing Michigan case law, an implied-in-fact contract need not be — and, indeed, typically is not — "manifested by direct or explicit words between the parties." *Erickson,* 180 N.W.2d at 800. After all, such discussions generally would give rise to a claim of an express (albeit oral) contract. A contract implied in fact, in contrast, may arise "from the conduct of the parties" that evidences their "mutual intent to contract," *Erickson,* 180 N.W.2d at 800, even absent any

---

[9]In their motions, Defendants also address the Michigan law governing contracts implied in law, as opposed to contracts implied in fact. Yet, it appears that Plaintiff's breach of contract claim rests solely upon the theory that an implied-in-fact contract arose between the parties. Thus, the Court need not consider the Michigan law concerning contracts implied in law.

13

discussions between the parties or explicit exchange of promises.

Defendants next cite the testimony of ETA's and EES's principal, Defendant Chipman, that she had no contact and reached no understanding with Plaintiff regarding the handling of the escrowed funds, but instead was retained by and received instructions solely from MEG.  The Michigan courts have explained, however, that the existence of an implied-in-fact contract is determined through "an objective test, looking to the expressed words of the parties *and their visible acts."  Rowe v. Montgomery Ward & Co.,* 437 Mich. 627, 473 N.W.2d 268, 273 (1991) (internal quotation marks and citations omitted) (emphasis in original); *see also Anton v. SBC Global Services, Inc.,* No. 08-1307, 350 F. App'x 39, 43 (6th Cir. Oct. 29, 2009).  In *Anton,* 350 F. App'x at 47-48, for example, the court rejected the defendant's contention that, in its view, it "did not provide 'expressed words' or 'visible acts' that could result in" an implied-in-fact contract, explaining that while the defendant "may not have subjectively believed it assented to those terms, that is not the test under Michigan law when deciding the terms of an implied-in-fact contract." Likewise, in this case, Ms. Chipman's subjective views as to the existence (or lack thereof) of a contractual relationship between her escrow agencies and Plaintiff do not foreclose a determination — whether by a trier of fact or by the Court as a matter of law, if "no essential facts are in dispute," *Erickson,* 180 N.W.2d at 800 — that an implied-in-fact contract arose from the conduct of the parties.[10]

---

[10]Along the same lines, Defendants point to a September 30, 2008 e-mail in which Plaintiff's representative, Mr. Lee, stated that a California firm, Pristine Escrow, would be

14

Finally, Defendants contend that any possible terms of an implied-in-fact contract that could be gleaned from the record would be too indefinite to be enforceable. Ordinarily, "the duties and liabilities imposed on an escrow agent are those set forth in the escrow agreement." *Hills of Lone Pine Association v. Texel Land Co.,* 226 Mich. App. 120, 572 N.W.2d 256, 258 (1997). Here, of course, there was no express escrow agreement governing the funds deposited by Plaintiff with ETA and then transferred to EES. Under these circumstances, the Michigan courts have found that an escrow agent's duties and responsibilities are determined by resort to the underlying agreement giving rise to the escrow arrangement. *See Whitney Properties, L.L.C. v. Philip F. Greco Title Co.,* No. 283120, 2009 WL 2195106, at *4 (Mich. Ct. App. July 23, 2009); *Naimou v. Philip F. Greco Title Co.,* No. 264503, 2006 WL 397940, at *1 (Mich. Ct. App. Feb. 21, 2006). In this case, the underlying document is the Agreement between Plaintiff and MEG, which called for Plaintiff to deposit funds with ETA. In Defendants' view, this

---

"handl[ing] the closing between Metro and Mt. Tai," and that Plaintiff therefore should "not be charged for" certain closing and other fees that were to be paid to Defendant ETA under a closing statement furnished by MEG. (*See* Defendant EES's Motion, Ex. 11.) Defendants view this as an "admission" that ETA did not serve as Plaintiff's escrow agent. Again, however, Mr. Lee's subjective views on the existence of an implied-in-fact contract with ETA or EES — like Ms. Chipman's views on the same subject — are not determinative of the question whether such an implied-in-fact contract came into existence by virtue of the parties' conduct. In addition, Plaintiff points out that Pristine Escrow and ETA/EES were asked to perform different functions, with the former involved in the actual closings on the California properties Plaintiff sought to acquire, while the latter entities were responsible only for holding and disbursing funds deposited into escrow by Plaintiff pursuant to its Agreement with MEG. Accordingly, and contrary to Defendants' contention, Mr. Lee's e-mail cannot be viewed as an acknowledgment that only Pristine Escrow, and not ETA or EES, was serving as an escrow agent for Plaintiff in its transaction with MEG.

15

Agreement lacks any language or terms that would provide sufficient guidance as to how the escrowed funds should be managed, how long they should be held, or the conditions under which they should be released, and Defendants contend that this purported indefiniteness is fatal to the recognition of an implied-in-fact contract.

The Court cannot agree. The courts are reluctant to hold a contract unenforceable "because of indefiniteness or missing details," so long as the material terms of the parties' agreement can be ascertained from the surrounding circumstances. *M & C Corp. v. Erwin Behr GmbH & Co.,* 143 F.3d 1033, 1039-40 (6th Cir. 1998); *see also Waites v. Miller,* 244 Mich. 267, 221 N.W. 171, 173 (1928) ("Courts do not favor the destruction of contracts because of indefiniteness and hold that uncertainty may be removed by subsequent acts, conduct, declarations, or agreements of the parties."). In this case, the deposition testimony of Ms. Chipman evidences her understanding that the Agreement between Plaintiff and MEG placed at least some limits on the disbursement of the funds placed in escrow under this Agreement, and imposed at least some duties on her and her firms as escrow agents. She acknowledged, for example, that the Agreement contemplated that funds would be released from escrow only to pay EMDs for properties that Plaintiff wished to acquire in California. (*See* Chipman Dep. at 30-35, 44.) She further recognized that she was not at liberty to disburse funds from the escrow account for a purpose other than an EMD merely because an MEG representative might direct her to do so; rather, she would have to satisfy herself that a breach of the Agreement had occurred before she could release the escrowed funds to MEG. (*See id.* at 44.)

16

Under this record, it is clear that the Agreement and its surrounding circumstances sufficiently delineated at least *some* of the duties owed by ETA and EES in handling the funds placed into escrow pursuant to this Agreement.  It is not enough, then, that Defendants might be able to conjure up hypothetical situations in which the Agreement, viewed in the context of the parties' contemporaneous conduct and statements, might not provide sufficient guidance as to how the escrowed funds should be managed or disbursed.  *See Farm Bureau Mutual Insurance Co. v. Nikkel,* 460 Mich. 558, 596 N.W.2d 915, 921 (1999) ("That a question of fact may exist regarding the applicability of the [contract terms] to specific circumstances does not render the [contract] language ambiguous.").  Rather, Plaintiff may seek to enforce an implied-in-fact contract so long as it can identify a breach of a duty that *was* sufficiently defined through the parties' course of conduct and the terms of the Agreement.[11]  Notwithstanding her assertion that she took instruction only from MEG, Ms. Chipman concedes that she and her firms were subject to defined and ascertainable duties in their handling and disbursement of the funds deposited by Plaintiff with ETA under the Agreement.  Accordingly, the Court is unpersuaded by Defendants' various efforts to establish as a matter of law that no implied-in-fact contract arose from Plaintiff's deposit of funds with ETA and the subsequent transfer of these funds to EES.

This leaves the more difficult question whether *Plaintiff* has established as a

---

[11]The Court addresses in greater detail below the question whether Plaintiff has established a breach of a duty that arose under an implied-in-fact contract between the parties.

17

matter of law both (i) the existence of an implied-in-fact contract with ETA and/or EES, and (ii) a breach of one or more duties owed under this implied contract.  In support of this contention, Plaintiff cites two instances of duties purportedly owed and breached by ETA and EES.  First, Plaintiff contends that when the transaction called for in the Agreement failed to close by the September 19, 2008 deadline set forth in the Agreement itself, ETA and EES were obligated to return to Plaintiff the funds held in escrow, but they failed to do so.  Alternatively, even if Plaintiff's conduct after this deadline were viewed as evidencing its willingness to go forward with the transaction, Plaintiff argues that ETA and EES remained obligated to disburse the escrowed funds only in accordance with the Agreement, which contemplated disbursements only (i) for EMDs on properties MEG sought to acquire on Plaintiff's behalf, or (ii) as liquidated damages owed to MEG in the event that Plaintiff canceled the transaction after the "due diligence period" defined in the Agreement.  Even assuming Plaintiff engaged in conduct that triggered the payment of liquidated damages under the Agreement — a proposition Plaintiff disputes — Plaintiff contends that any such breach surely did not permit ETA or EES to disburse the *entirety* of the escrowed funds to MEG.

The Court agrees with Plaintiff that, as a matter of law, ETA and EES breached duties owed to Plaintiff under an implied-in-fact contract governing their handling and disbursement of the funds Plaintiff deposited into escrow under the Agreement.  To be sure, the Agreement lacks specificity as to precisely how the escrowed funds were to be managed and disbursed, and the extrinsic record sheds little additional light on this

18

subject.  Yet, Defendants have utterly failed to suggest any possible reading of the

Agreement, nor have they identified anything in the parties' conduct or surrounding

circumstances, that would authorize them to transfer the entirety of the escrowed funds to

MEG.  The ordinary use of these funds, as contemplated and acknowledged by all parties,

was to pay EMDs toward the purchase of properties, and Defendants do not contend that

the transfer of the escrowed funds to MEG was intended to serve this purpose.  In

addition, while the Agreement called for the forfeiture of a portion of these funds and the

payment of liquidated damages under certain circumstances, nothing in the record

supports the proposition that this would amount to anything close to the $649,500.00

transferred by EES to MEG in early October of 2008.  To the contrary, Corey Howard of

MEG claimed in an October 10, 2008 letter that $186,000 in liquidated damages were

properly assessed against Plaintiff, (*see* Plaintiff's Motion, Ex. 20), and Defendant

Chipman computed these liquidated damages as totaling (at most) $217,750, (*see*

Plaintiff's Motion, Ex. 10).  Even accepting these figures, and even assuming it would

have been appropriate for EES as escrow agent to disburse funds from the escrow account

to satisfy one contracting party's claim for liquidated damages, the Court finds that

Plaintiff has established as a matter of law the necessary two predicates to breach-of-

contract liability:  namely, (i) that an implied-in-fact contract arose between Plaintiff and

Defendants ETA and EES when the latter firms agreed to hold funds in escrow for use in

the transaction between Plaintiff and MEG; and (ii) that these Defendants plainly acted in

excess of their authority under this implied-in-fact contract by transferring escrowed

19

funds to MEG that far exceeded any amount MEG could tenably claim to be owed under its Agreement with Plaintiff.

In an effort to avoid this result, Defendants contend that they took instruction solely from MEG, which directed them to transfer the entirety of the escrowed funds. (*See* Chipman Dep. at 64, 66; *see also* Plaintiff's Motion, Ex. 18 (10/6/2008 memo from Corey Howard of MEG to Ms. Chipman at EES, instructing her to forward all remaining funds to MEG).)  As explained earlier, however, the existence and terms of an implied-in-fact contract do not turn upon Defendants' subjective views as to the duties they owed and the parties to whom they owed them.  In addition, the Michigan courts have held that "[a]n escrow agent is the agent of both parties to the escrow agreement." *Smith v. First National Bank & Trust Co.,* 177 Mich. App. 264, 440 N.W.2d 915, 918 (1989); *see also Frankiewicz v. Konwinski,* 246 Mich. 473, 224 N.W.2d 368, 370 (1929).  This duty owed to both parties ceases only "when the property has been placed in escrow under an agreement that it is to go to [one of the contracting parties] upon the meeting of a condition ***and that condition is met."*** *Smith,* 440 N.W.2d at 918 (emphasis added).  To the extent that an escrow agent relies on the representations of one of the contracting parties that such a condition has been met and that the property held in escrow may be released, the escrow agent "act[s] at its own peril" by accepting and carrying out this unilateral directive.  *Whitney Properties,* 2009 WL 2195106, at *4.

In this case, Defendants cannot point to any condition or development that would have fully discharged their obligation to Plaintiff and permitted them to disburse the

20

entirety of the escrowed funds to MEG.  Nor is it sufficient that MEG represented to Defendants that this disbursement was appropriate.  Rather, having voluntarily agreed to serve as escrow agent under the Agreement between Plaintiff and MEG, Defendants ETA and EES assumed a duty to hold and disburse the escrowed funds only in accordance with the terms of the implied-in-fact contract that governed the relationship between ETA/EES as escrow agent and the two principals, Plaintiff and MEG.[12]

Finally, Defendant ETA separately argues that it could not have breached any implied-in-fact contract with Plaintiff because its role in the underlying transaction between Plaintiff and MEG ceased well before any escrowed funds were improperly disbursed to MEG.  In particular, ETA points to Ms. Chipman's September 10, 2008 letter to MEG stating that, on the advice of ETA's underwriter, all of the escrowed funds were being transferred to a newly formed entity, EES.  (*See* Plaintiff's Motion, Ex. 7.)  It follows, in ETA's view, that its actions did not contribute to any breach of an implied-in-fact contract, because its involvement had ended prior to the disbursement of escrowed funds upon which Plaintiff's breach of contract claim is based.

---

[12]Throughout their submissions to the Court, Defendants make much of the fact that they never entered into any sort of escrow agreement with Plaintiff that expressly delineated their obligations with respect to the escrowed funds.  Yet, the Court fails to see how this absence of an explicit escrow agreement is helpful to Defendants here.  As an example, if Defendants wished to confirm to all parties that they intended to serve solely as the agent of MEG in the transaction contemplated under the Agreement, a written escrow agreement would have provided an opportunity to memorialize this understanding.  In the absence of such an express agreement, the parties' obligations must be derived from ordinary principles of Michigan law.  As discussed, these principles dictate that an escrow agent presumptively serves on behalf of both parties to the underlying transaction.

The Court cannot agree.  First, just as Defendants generally have failed to identify any authority for disbursing the entirety of the escrowed funds to MEG, Defendant ETA has failed to identify any authority for transferring these funds to EES.  If ETA determined that it could not continue to serve as escrow agent, its options were to tender the escrowed funds back to Plaintiff or secure the consent of **both** Plaintiff and MEG to transfer the funds to EES.  It is undisputed that Plaintiff did not know of this transfer, much less consent to it.  Moreover, it cannot be said that this transfer played no role in any ensuing injury to Plaintiff, where the transfer of the escrowed funds to EES facilitated — and thus was causally linked with — the subsequent disbursement of these funds to MEG.  Finally, it is important to note that, despite what Ms. Chipman might have stated in her September 10, 2008 letter to MEG, ETA did not actually transfer the entirety of the escrowed funds to EES on that date; rather, it appears that the last of these funds were transferred from ETA to EES on October 7, 2008, (*see* Plaintiff's Motion, Ex. 9), just **one day** before EES transferred these funds to MEG's general account.[13]  Under this record, the Court finds that Plaintiff is entitled to summary judgment in its favor and against ETA and EES alike on its Count I claim of breach of an implied contract.[14]

---

[13]Indeed, given the intermingling of the escrowed funds with MEG's general account, and given the MEG ledger showing that funds from this general account subsequently were disbursed to ETA, EES, and Ms. Chipman, as well as ETA's counsel, it can hardly be said that ETA wholly disassociated itself from the escrowed funds in mid-September of 2008.

[14]In its summary judgment motion, Plaintiff requests not only a ruling in its favor as to liability, but also seeks an award of damages representing the full amount it paid into escrow (*i.e.,* $686,550) under its Agreement with MEG.  Yet, in a separate consent judgment, Defendant MEG has agreed to pay $475,000 to Plaintiff in satisfaction of the Count I breach of contract

**C.      Plaintiff's Negligence/Breach of Fiduciary Duty Claim Against Defendants EES and Chipman**

In Count II of its second amended complaint, Plaintiff alleges that Defendants EES and Janel Chipman breached fiduciary duties and tort-based duties of due care owed to Plaintiff by disbursing the entirety of the escrowed funds to MEG, thereby taking sides in a transaction in which these Defendants were obligated to act as neutral agents on behalf of both Plaintiff and MEG.  Again, as with its breach of contract claim, Plaintiff contends that both the fiduciary duties owed by EES and Ms. Chipman and the breach of these duties are established as a matter of law.  In opposition to this contention, and in support of their own cross-motion for summary judgment in their favor, Defendants EES and Chipman once again maintain that they owed no duty to Plaintiff that could sustain a breach of fiduciary duty or negligence claim.  For reasons much the same as those discussed earlier in connection with Plaintiff's breach of contract claim, the Court finds that Plaintiff is entitled to summary judgment in its favor on its breach of fiduciary duty claim.

As they argued with respect to Plaintiff's breach of contract claim, Defendants

---

claim against MEG, in exchange for the dismissal with prejudice of all other claims against MEG and Defendant Corey Howard.  Plaintiff makes no effort to address the question whether this consent judgment might operate to reduce its available recovery from Defendants ETA and EES, and the Court declines to raise and decide this issue of its own initiative.  Neither do the parties address the question whether the amount sought by Plaintiff is subject to reduction or setoff — *e.g.,* by the value of any services provided by Defendants to Plaintiff.  Accordingly, these issues of damages cannot be resolved as a matter of law at the present juncture, but instead will be addressed in a separate proceeding.  Through the present ruling, the Court grants summary judgment in Plaintiff's favor as to liability only.

Chipman and EES contend that they owed neither fiduciary duties nor a duty of due care to Plaintiff.  In Defendants' view, when they were called upon to act in the absence of either a written escrow agreement or an underlying Agreement that specifically defined their duties, they appropriately turned to MEG and justifiably relied on MEG's representations as to how the escrowed funds should be disbursed.  In particular, once Corey Howard of MEG advised Ms. Chipman in an October 6, 2008 letter that Plaintiff had failed to carry out its part of a transaction discussed between Plaintiff and MEG at the end of September, (*see* Plaintiff's Motion, Ex. 18), Defendants argue that they were entitled to accept this representation and release the escrowed funds to MEG.

Once again, however, the Court finds that the duties imposed under Michigan law are not so easily abdicated.  In *Smith, supra,* 440 N.W.2d at 918, after affirming that "[a]n escrow agent is the agent of both parties to the escrow agreement," the Michigan Court of Appeals held that "an escrow agent may be liable in tort for the negligent performance of its duties as escrow agent or breach of fiduciary responsibilities owed to its principal." Moreover, having agreed to hold funds in escrow for use in the transaction contemplated under the Agreement between Plaintiff and MEG, Defendants were "charged with a strict execution of the duties voluntarily assumed" as escrow agents.  *Naimou, supra,* 2006 WL 397940, at *1.  Thus, upon accepting the escrowed funds, Defendants were not at liberty to choose to represent (and owe duties to) only one party to the Agreement, but rather owed duties to both sides to hold and disburse these funds solely in accordance with the terms of the parties' Agreement.

24

Having determined that Defendants owed the duties identified in Count II of the complaint, it remains only to ask whether Defendants breached these duties. Again, the Court's foregoing analysis of Plaintiff's breach of contract claim disposes of this question as well. As explained earlier, Defendants "acted at [their] own peril," *Whitney Properties,* 2009 WL 2195106, at *4, by accepting MEG's unilateral representation that the entirety of the escrowed funds were to be released to MEG. Because there is no plausible reading of the underlying Agreement that would have authorized this disbursement, the Court finds that Plaintiff has established as a matter of law a breach of the fiduciary duties and duty of due care owed to it by Defendants EES and Chipman. It follows that this aspect of Plaintiff's summary judgment motion must be granted, and that Defendants' cross-motion must be denied.[15]

### D.     Plaintiff's Claim of Unjust Enrichment

In Count III of its second amended complaint, Plaintiff alleges that Defendants ETA, EES, and Chipman unjustly enriched themselves at Plaintiff's expense by obtaining a benefit from the funds deposited into escrow by Plaintiff, while at the same time failing to fulfill their obligations to Plaintiff. As the final point of contention raised in the parties' pending cross-motions, Defendants seek an award of summary judgment in their favor on this claim of unjust enrichment, on the ground that they purportedly realized no

---

[15]Again, the issue of damages remains to be resolved at a subsequent proceeding.

benefit from their involvement in the transaction between Plaintiff and MEG.[16]

The Court readily concludes that issues of fact remain as to whether Defendants were unjustly enriched by the actions they took as escrow agent in the transaction between Plaintiff and MEG.  First, Ms. Chipman acknowledged at her deposition that her firm, EES, took $16,750 in fees from the escrowed funds before transferring the balance of these funds to MEG's general account.  (*See* Chipman Dep. at 91; *see also* Plaintiff's Motion, Ex. 10.)  Although Defendant EES asserts in its summary judgment motion that it "had a legal right to these fees as bargained for consideration for acting as escrow agent on MEG's behalf," (Defendant EES's Motion, Br. in Support at 13), this claim is utterly unsupported by citation to any evidence in the record.  Thus, for purposes of deciding EES's motion, it can hardly be accepted as undisputed fact that EES was entitled to these fees.  Rather, under the present record (or lack thereof), a trier of fact could equally well conclude that these fees, whether in whole or in part, represented an undeserved benefit to EES at Plaintiff's expense.

Next, and more generally, the undisputed record establishes that the entirety of the escrowed funds (less the fees taken by EES) were placed into MEG's general account, and that funds subsequently were disbursed from this account to ETA, EES, and Chipman

---

[16]The Court notes that Plaintiff does not seek summary judgment in its favor on this claim of unjust enrichment.  Rather, its cross-motion for summary judgment is directed only at Counts I and II of the complaint.  In addition, while Defendants request an award of summary judgment in their favor as to the claim of conversion set forth in Count IV of the complaint, Plaintiff concedes in its responses to Defendants' motions that its claim of conversion was asserted only against Defendants MEG and Corey Howard, and not against ETA, EES, or Ms. Chipman.

(as well as ETA's counsel).  Certainly, none of these Defendants has established as a matter of law that these disbursements were proper and wholly unrelated to EES's release of the escrowed funds to MEG.  Indeed, Defendants would find it difficult to establish this proposition as a matter of law, where their motions and accompanying briefs fail to even acknowledge these disbursements, much less attempt to explain how they might qualify as benefits received from a source other than the funds deposited by Plaintiff into escrow.  Under this record, issues of fact remain as to whether Defendants unjustly enriched themselves from the funds placed into escrow by Plaintiff.[17]

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's March 1, 2010 motion for partial summary judgment (docket #75) is GRANTED as to the issue of the liability of Defendants ETA, EES, and Chipman under Counts I and II of Plaintiff's second amended complaint, with the issue of damages to be addressed in a subsequent proceeding.  IT IS FURTHER ORDERED that the March 1, 2010 motion for summary

---

[17]Defendant ETA's motion alludes to a potential interplay between Plaintiff's breach of contract claim and its claim of unjust enrichment.  As the Sixth Circuit observed in a case arising under Michigan law, "the existence of an implied-in-fact contract, which provides a legal remedy, will bar a claim of unjust enrichment, which seeks an equitable remedy."  *Kingsley Associates, supra,* 65 F.3d at 506.  Thus, to the extent that Plaintiff is made whole by a damage award pursuant to a breach of contract theory, it would not be entitled to an additional recovery under Count III of its complaint.  Because the issue of damages will be addressed in a forthcoming proceeding, the Court need not decide at present whether Plaintiff's claim of unjust enrichment provides an avenue for any further recovery.

27

judgment filed by Defendants EES and Chipman (docket #79) is DENIED.  Finally, IT IS

FURTHER ORDERED that Defendant ETA's March 1, 2010 motion for summary

judgment (docket #80) is DENIED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  January 10, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on January 10, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager